UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DAVID L. VINCENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CV-191 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff David L. Vincent appeals to this Court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED and the case REMANDED for further proceedings.

## I. PROCEDURAL HISTORY

Vincent applied for benefits on June 4, 2004, alleging that he became disabled as of January 19, 2004. (Tr. 72-74; 415-18.) The Commissioner denied his application initially and upon reconsideration, and Vincent requested an administrative hearing. (Tr. 48-50; 52-56; 406-14.) Administrative Law Judge ("ALJ") Bryan Bernstein conducted a hearing on January 31, 2007, at which Vincent, who was represented by counsel; Ms. Donna Niblick, Vincent's girlfriend; and Mr. Joseph Thompson, a vocational expert ("VE"), testified. (Tr. 427-60.)

On September 28, 2007, the ALJ rendered an unfavorable decision to Vincent,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

1

concluding that he was not disabled because he could perform a significant number of jobs in the national economy. (Tr. 14-31.) Vincent filed a Request for Review with the Appeals Council, which was denied, however, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-13.) Vincent filed a complaint with this Court on July 15, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.) On appeal, Vincent argues that the ALJ improperly evaluated the medical opinion of a treating physician, Dr. Ralph Waldo. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Br.") 13-19.)

## II. FACTUAL BACKGROUND[2]

### A. Background

Vincent was thirty four years old at the time of the hearing. (Tr. 72.) He did not complete high school, but later obtained an equivalency degree through the mail. (Tr. 269.) Vincent had past relevant work as a torch cutter, transfer press operator, furnace feeder, and cell operator. (Tr. 136.) Vincent alleges that he is disabled due to amnestic disorder following traumatic brain injury, borderline intellectual functioning, major depression, and anxiety. (Br. 2.)

### B. Summary of Relevant Medical Evidence

On October 20, 1994, Vincent was treated for a head injury at Parkview Hospital after an automobile accident. (Tr. 213.) His physicians noted that he had a past history of alcoholism and that he had also suffered a minor closed head injury in a March 1994 moped accident. (Tr. 213.) A CT scan showed a minor amount of blood in the subdural space without mass effect or shift. (Tr. 213.) Vincent underwent a program of rehabilitation and was discharged on November 4, 1994. At discharge, it was noted that he was awake and oriented, no longer agitated or confused,

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 460-page administrative record necessary to the decision.

able to follow complex commands, and demonstrated a full range of motion in all extremities with good strength. (Tr. 213.)

On October 16, 1995, Vincent was treated at the Bowen Center for alcohol dependence. (Tr. 144.) He reported that he started drinking at the age of 14 and that he drank extensive amounts of alcohol until he was involved in the car accident at age 25. (Tr. 144.) He stated that he had four arrests for driving under the influence. (Tr. 144.) The Bowen Center determined that Vincent met the criteria for admission and that his prognosis was fair. (Tr. 144.)

On October 24, 1995, Vincent was evaluated by Dr. William Yee for complaints of difficulties in concentration. (Tr. 155.) He stated that he did not "do much anymore" and that he "just [sat] in a daze." (Tr. 155.) Vincent did, however, report that he was working full-time in a machine shop. (Tr. 155.) He told Dr. Yee that he has had problems with depression since childhood and Dr. Yee noted that he had some poverty of thought, psychomotor retardation, intact recent and remote memory, excellent judgment, and that his energy level was consistent with significant clinical depression. (Tr. 156.) Dr. Yee diagnosed Vincent with dysthymia, social phobia, and alcohol dependence in remission and he received treatment, including group discussions and therapy through January 1996. (Tr. 140-43, 146-54, 159-67.)

In December 1995, Vincent was examined by Bryan Ciula, Ph.D., on referral from Dr. Yee, to determine the scope of any impairment caused by Vincent's alcoholism and/or his head trauma. (Tr. 138-39.) Vincent claimed that he had difficulties with his short term memory and that he was unable to recall conversations just minutes after they had occurred. (Tr. 138.) Vincent told Dr. Ciula that he had not had any alcohol in two months. (Tr. 138.) Dr. Ciula administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R), which indicated that

Vincent had a verbal IQ in the high borderline range, and performance and full scale IQs in the borderline range. (Tr. 138.) The memory quotient of the WAIS-R indicated that Vincent had difficulty with short term memory and immediate recall of verbal and visual stimuli. (Tr. 138.) Vincent scored poorly on complex problem solving that required abstract reasoning and flexibility of thinking. (Tr. 138.) Dr. Ciula concluded that impairment was most pronounced in higher order reasoning, problem solving skills, and flexibility of thinking. (Tr. 139.) Dr. Ciula also noted that Vincent had some difficulty in his ability to sustain attention and immediately recall information. (Tr. 139.)

The record does not contain any evidence of mental health symptoms until October 2002, when Vincent reported problems with anxiety and concentration, a lack of energy, loss of appetite, and persistent feelings of sadness and worthlessness to his primary care physician. (Tr. 349.) Vincent then saw his family physician, Dr. Richard Kelty, from November 2002 to March 2003, and reported similar problems. (Tr. 344-48.)

In January 2004, Vincent was examined by a psychiatrist, Dr. Ralph Waldo. (Tr. 390.) Vincent reported that he was irritable, that his mood could be better, and that he had increasing problems with concentration. (Tr. 390.) His life stressors included losing his job because of attendance issues and criminal proceedings that resulted from him hitting his girlfriend's child. (Tr. 390.) He told Dr. Waldo that he was smoking two and a half packs of cigarettes every day and drinking five to six cups of coffee and two to three sodas every day. (Tr. 390.) During a March 2004 visit, Vincent reported that he felt alright, but that he was experiencing increased anger, anxiety, and worry. (Tr. 389.) He also reported financial problems resulting from his job loss. (Tr. 388.) In an April 2004 visit, he again reported problems with concentration and stress

4

from financial problems. (Tr. 388.)

On May 30, 2004, Vincent went to the emergency room with complaints of chest pain. (Tr. 184-86.) He reported that he got drunk on Friday night, felt achy on Saturday, and began to experience chest pain while drinking coffee on Sunday morning. (Tr. 184-86.) He also stated that he was smoking three packs of cigarettes per day. (Tr. 184-86.) He was diagnosed with an acute myocardial infarction—a heart attack—and underwent a successful cardiac catheterization. (Tr. 182-91.) He was discharged on June 3, 2004, and given instructions to stop smoking and begin a home-walking program. (Tr. 170, 179.)

On July 21, 2004, Dr. Rosalind Huang performed a consultative evaluation of Vincent. (Tr. 249-54.) He told Dr. Huang that he stopped working in January 2004 because he could no longer handle his job and that his doctor told him to stop working after his heart attack. (Tr. 249, 252.) On examination, Dr. Huang observed that Vincent's motor activity was normal, his speech was clear, his comprehension and concentration were fair, his memory was weak, and his judgment was limited. (Tr. 250.) Dr. Huang administered the Wechsler Adult Intelligence Scale - Third Edition, and Vincent scored in the low borderline range on his full scale, verbal, and performance IQs. (Tr. 252-53, 255-57.) He scored well below the mean score for comparable individuals on memory tests. (Tr. 253-60.) Dr. Huang diagnosed Vincent with amnestic disorder due to traumatic brain injury and heart attack, and borderline intellectual functioning. Dr. Huang also assigned Vincent a Global Assessment of Functioning ("GAF") Score of 50.[3] (Tr. 254.)

In August 2004, an MRI of Vincent's brain showed atrophy and premature white matter

---

[3] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS - Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 50 is indicative of an individual who has serious symptoms or any serious impairments in social, occupational, or school functioning.

5

signal abnormalities consistent with prior closed head trauma. (Tr. 263.) In September 2004, Dr. Waldo diagnosed Vincent with a generalized anxiety disorder, impulse control disorder, and attention deficit hyperactivity disorder. (Tr. 391.) Vincent had reported poor focus and concentration and that he was $45,000 in debt, had no insurance, and did not know what he was going to do with his life. (Tr. 391.)

On October 7, 2004, Dr. F. Kladder, a reviewing psychologist with the state agency, completed a psychiatric review technique form. (Tr. 291-93.) Dr. Kladder noted that Vincent had tested poorly on the memory testing with Dr. Huang, but that they were even lower than expected given his activities of daily living. (Tr. 293.) Dr. Kladder found that Vincent appeared to have the mental residual functional capacity to do work that involved simple, repetitive tasks. (Tr. 293.) Dr. Kladder also found that Vincent had mild restrictions in his activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 315.)

On October 14, 2004, Vincent followed-up with Dr. Basil Genotos at Fort Wayne Cardiology. (Tr. 362.) Dr. Genotos noted that Vincent was doing well and felt that he could actively seek employment. (Tr. 362.) Dr. Genotos emphasized the importance of not smoking and increased Vincent's Lipitor prescription. (Tr. 362.) Vincent saw Dr. Waldo that same day and reported to him that he was doing "pretty good" but that he still had some problems with concentration and focus. (Tr. 385.)

On October 21, 2004, Vincent saw Dr. Judy Neer, a neurologist, for evaluation. He presented with headache, fatigue, and depression and reported that he felt drained all of the time. (Tr. 278-79.) He believed that this was related to his cardiac condition. (Tr. 278.) Dr. Neer

6

reviewed Vincent's MRI results and noted that they showed atrophy, which was more pronounced for his age, and evidence of scattered small vessel ischemic changes. (Tr. 279.) She diagnosed Vincent with a closed head injury resulting in mild cognitive impairment and depression and observed that he appeared to be doing quite well despite his past history. (Tr. 279.)

In November 2004, Dr. Sherwin Kepes conducted a consultative evaluation of Vincent. (Tr. 268-72.) He told Dr. Kepes that he lost his job in January 2004, "because he missed work and was fatigued all the time." (Tr. 269.) Dr. Kepes observed that Vincent was cooperative and responded appropriately to his questions. (Tr. 270.) Dr. Kepes administered the Wechsler Adult Intelligence Scale - Second, and Vincent received full scale, verbal, and performance IQ scores in the low average range. (Tr. 270.) Vincent's memory testing was generally consistent with his IQ scores, but they did show that he performed significantly better with auditory stimuli than with visual stimuli. (Tr. 270-71.) Dr. Kepes ultimately concluded that Vincent's difficulties with his working memory would make it difficult for him to rapidly learn new situations, or to quickly adjust to rapid changes and working speed. (Tr. 271.) Dr. Kepes diagnosed Vincent with a cognitive disorder and borderline intellectual functioning and indicated that he should be in a work environment that was repetitive and not fast-paced. (Tr. 272.)

In December 2004, Vincent saw Dr. Waldo and reported that he felt down and was more irritable. (Tr. 384.) He reported his life stressors as lack of money. (Tr. 384.) Vincent returned to Dr. Waldo in April 2005 and complained of depression, anxiety, inattention, agitation, and angry outbursts. (Tr. 383.) He again reported that his finances were a significant life stressor. (Tr. 382-83.) Dr. Waldo noted that he was calm, pleasant, conversive, and cooperative; his

7

affect and speech were appropriate; his thought processes appeared logical and coherent; he had no evident memory disturbances; and he exhibited fair judgment and insight. (Tr. 382-83.) Dr. Waldo observed that he did not believe Vincent would have been able to work the majority of the time that he had treated him over the past two years because of his head injury, depression, anxiety, and inattention. (Tr. 383.) He then noted, however, that he believed Vincent was currently able to work and could become "a productive member of society." (Tr. 383.)

Vincent received continuing treatment from Dr. Waldo every two to three months until September 2006. In October 2005, Vincent reported to Dr. Waldo that he was enrolled in school at Ivy Tech. (Tr. 375.) He stated that he was failing his pre-algebra class, but was earning B's in several other classes. (Tr. 375.) In December 2005, Vincent reported that he was doing well in school and that he planned on returning for the following semester. (Tr. 372.) He also told Dr. Waldo that he had found a job at the end of the previous October, but that he was let go "because they were moving out of town." (Tr. 372.) Dr. Waldo noted that Vincent was to discontinue his Ritalin prescription. (Tr. 373.)

In February 2006, Vincent saw Dr. Waldo and reported that he was failing school and believed he should be taking Ritalin again because he was having difficulty focusing. (Tr. 369.) He informed Dr. Waldo that he had recently gotten a job delivering newspapers and that it helped to cover some of his expenses. (Tr. 369.) He told Dr. Waldo he was depressed because of his problems with school and stated: "If I don't pass school I will need Dr. Waldo to push for my Social Security." (Tr. 369.) Dr. Waldo re-instituted Vincent's Ritalin prescription. (Tr. 370.)

Vincent saw Dr. Waldo again in June 2006 and stated that he had failed one of his classes and was still feeling down. (Tr. 366.) He reported that he was experiencing stress from "school,

8

family life, ADHD kid" and his finances. (Tr. 366.) He indicated that he wanted to apply for Social Security benefits because school was going to cost him too much. (Tr. 366.) He also indicated that he was unemployed and had been "downsized" at his last place of employment. (Tr. 366.) Vincent saw Dr. Waldo again in September 2006 and informed him that he was more depressed and his mood fluctuated up and down. (Tr. 393.) He stated that he was currently enrolled in four classes and that school was "going good." (Tr. 393.)

Dr. Waldo completed a medical source statement in February 2007, concerning Vincent's mental abilities. (Tr. 397-400.) He found that Vincent had poor short-term memory, focus, and concentration and was easily distracted. (Tr. 397.) He concluded that Vincent had a poor ability to carry out and understand short, simple or detailed instructions; maintain attention and concentration for an extended period; and work with others without being distracted. (Tr. 400.) Dr. Waldo also noted that he was unable to evaluate Vincent in a variety of other factors, including his ability to remember locations and work-like procedures; perform activities within a schedule, maintain regular attendance, and be punctual; and complete a normal workday or workweek. (Tr. 399.)

*C. Vincent's Hearing Testimony*

On January 31, 2007, Vincent appeared with counsel and testified before the ALJ. (Tr. 429-60.) The ALJ questioned Vincent about his daily activities and alcohol use. Vincent testified that he had stopped drinking a few weeks prior to the hearing. He stated that his live-in girlfriend did the cooking and that he sometimes helped her with grocery shopping. (Tr. 433.)

Vincent was then questioned by his attorney. He stated that he was fired from his last job due to his absenteeism, which he ascribed to his fatigue. (Tr. 434.) Vincent testified that his

9

fatigue has improved with cardiac treatment, but that his depression and short-term memory loss kept him from working. Vincent stated that his depression had been a near-constant problem since his car accident in 1994 and that it had become worse since he stopped working. (Tr. 435.) He testified that he had serious problems with his short-term memory loss and concentration and often forgets events after just five minutes. (Tr. 436.) Vincent stated that the financial difficulties caused by his lack of employment exacerbated his memory and concentration problems. (Tr. 437.) Vincent also stated that he had problems controlling his behavior, such as his compulsive spending and smoking three packs of cigarettes every day. (Tr. 437.)

Vincent testified that he had been in vocational rehabilitation starting in 2005 and was trying to get a degree in machining. (Tr. 440.) He stated that he attended classes three days a week and that he had problems oversleeping and missing classes. (Tr. 442-43.) Vincent also testified that he has had a paper route for the last year and delivered papers seven days a week. (Tr. 444.) He is able to complete the route himself, which he explained took approximately one and a half hours and involved walking and driving. (Tr. 444.)

Donna Niblick, Vincent's girlfriend, also testified. She stated that Vincent occasionally told her that he thought about committing suicide, but she did not believe he would. (Tr. 447.) She stated that he often played games on the computer and that he had become withdrawn from family and friends. (Tr. 447-50.) Ms. Niblick also testified that Vincent had problems controlling his temper and that in the past he had hit her son, tore down their Christmas tree, and smashed a television set. (Tr. 451.)

Finally, Mr. Joseph Thompson, the VE, testified. The ALJ asked him to consider a hypothetical individual who could perform light work with the following additional limitations: a

sit/stand option; no work in dust, smoke, chemical fumes, or extreme temperatures and humidity; no work that imposed a close regimentation of production as a consequence of operational demands for functioning within close tolerances or for an unusually rapid level of productivity; no work that imposed intense contact with the public or strangers; and no work that demanded significant language processing challenges or detailed complex instructions. (Tr. 457-58.) The ALJ also instructed the VE that this individual could only perform work that involved short, simple instructions and repetitive challenges and he would require additional instruction in work with verbal requirements because of his short-term memory impairment. (Tr. 458.) In response to the ALJ's hypothetical, the VE testified that this individual would be unable to perform Vincent's past relevant work. The VE did, however, identify other light, unskilled work which the individual could perform, including jobs as a production inspector, shipping and receiving weigher, and a machine tender. (Tr. 458.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

11

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R.

---

[4] Before performing steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a),

12

§§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On September 28, 2007, the ALJ rendered his decision. (Tr. 14-3.) He found at step one of the five-step analysis that Vincent had not engaged in substantial gainful activity since his alleged onset date of January 19, 2004. (Tr. 20.) At step two, he determined that Vincent had severe impairments (Tr. 20), but at step three, he found that Vincent's impairments were not severe enough to meet a listing. (Tr. 21.) The ALJ also found that Vincent's disability allegations and testimony were not reliable. (Tr. 21-23.) Additionally, the ALJ determined that Vincent's RFC would allow him to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can not perform work that imposes a close regimentation of production; work that imposes intense contact with the public or strangers; work that demands significant language processing challenges or detailed/complex instructions; and work that provides the option to sit or stand while working. (Tr. 23-24.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Vincent was unable to return to his past relevant work as a torch cutter, transfer press operator, furnace feeder, or cell operator. (Tr. 30.) However, the ALJ concluded that there are a significant

---

416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

number of jobs in the regional economy that Vincent could perform, such as product inspector (300 jobs), shipping and receiving weigher (200 jobs), and machine tender (500 jobs). (Tr. 31.) He therefore concluded at step five that Vincent was not under a disability at any time from the alleged onset date through the date of the decision and his claim for benefits was denied. (Tr. 31.)

### C. The ALJ Did Not Properly Consider the Opinions of Dr. Waldo

Vincent's argument on appeal is that the ALJ improperly evaluated the opinion of a treating physician, Dr. Ralph Waldo. Specifically, Vincent claims that the ALJ erred when he found that the limitations expressed in Dr. Waldo's Medical Source Statement were consistent with his RFC. (Tr. 14-17.) Vincent's argument is ultimately successful and warrants a remand of this case to the ALJ for further consideration.[5]

The RFC is a determination of the tasks a claimant can do despite his limitations. *See* SSR 82-62. While the RFC can be expressed in terms of exertional categories such as "light", medium", or "heavy", the ALJ must first make a more detailed function-by-function assessment of the claimant's current physical and mental abilities. SSR 96-8p. The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant non-medical evidence, such as observations [by] a lay witness of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p. In doing so, an ALJ must consider the combined effect of

---

[5] Vincent also offers several reasons why the ALJ erred in evaluating an April 2005 medical report from Dr. Waldo. (Tr. 17-19.) These arguments ultimately amount to an unsuccessful plea to this Court to re-examine the evidence in the hope that it will come out in favor of Vincent. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).

a claimant's severe and non-severe impairments when assigning an RFC. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Clifford*, 227 F.3d at 873; *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870. However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore,"[a] claimant is not entitled to DIB simply because his treating physician states that he is 'unable to work' or 'disabled.'" *Clifford*, 227 F.3d at 870. The determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or

special significance." SSR 96-5p; *see also* 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006).

In the present case, Dr. Waldo's Medical Source Statement opined that Vincent had no useful ability to "maintain attention and concentration for extended periods." (Tr. 399.) Dr. Waldo also found that Vincent had no useful ability to "work with or near others without being distracted by them." (Tr. 399.) In crafting his RFC, the ALJ discussed the Medical Source Statement and found that although some portions were inconsistent with the record, it otherwise supported his RFC. Specifically, the ALJ found that "the responses . . . indicating that [Vincent] would be significantly impaired in terms of understanding, remembering, and carrying out simple instructions" were not supported, because Vincent had earned B's in school and was able to work a paper route. (Tr. 27-28.)

The ALJ ultimately concluded that Vincent's RFC would not allow him to perform work that imposed a close regimentation of production:

> Close regimentation of work activity is a consequence of certain operational demands for functioning within close tolerances or for an unusually rapid level of productivity. This might be required when there is a high value placed on product quality, the raw materials, the equipment employed, or coordination with others and the pace of production. Close and critical supervision in this context would produce unacceptable distress. This work is different from jobs that allow the employee some independence in the determination of timing different work activities or to determine the pace of work. Such flexibility as that in the work structure permits the employee an opportunity to catch up with ordinary productivity, especially when there has been a respite.

(Tr. 23.)

Similarly, the ALJ found that Vincent would not be able to perform work that imposed intense contact with the public or strangers. "Such a position exposes a person to the emotional challenges of strangers who may have a personal response that disturbs sensitive employees.

16

Customers with emergencies or extreme dissatisfaction with service or products can display emotions that make public contact too uncomfortable for the claimant." (Tr. 23.)

Vincent is, in essence, claiming that the limitations expressed in Dr. Waldo's Medical Source Statement are more severe than those found in the RFC, but that the ALJ stated in his decision that the Medical Source Statement was largely consistent with the RFC. That is, he claims that the ALJ's finding that he could engage in jobs that allowed *some* independence in regard to timing and pace is inconsistent with Dr. Waldo's opinion that Vincent had *no* useful ability to maintain attention and concentration for extended periods. Likewise, Vincent asserts that the ALJ's finding that he was only unable to do work that imposed *intense* contact with the public or strangers and had close and critical supervision is inconsistent with Dr. Waldo's finding that he had *no* useful ability to "work with or near others without being distracted by them." Vincent therefore argues that the ALJ's decision is not based on substantial evidence because it does not account for these discrepancies. Notably, the Commissioner does not challenge this argument in his Response Brief.

Vincent's argument, however poorly stated, has merit. "[A]n ALJ must articulate, at some minimum level, [his] analysis of the evidence. [He] is not required to address every piece of evidence or testimony, but must provide some glimpse into [his] reasoning." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001) (citing *Zurawski*, 245 F.3d at 888-89); *Clifford*, 227 F.3d at 872. The Court "must be able to trace the ALJ's path of reasoning," *Id*. at 874, and the ALJ must create "an accurate and logical bridge between the evidence and the result." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

Here, the Court can not easily trace the ALJ's path of reasoning. Dr. Waldo's Medical

Source Statement found that Vincent had no useful ability to "maintain attention and concentration for extended periods" or to "work with or near others without being distracted by them." (Tr. 399.) The ALJ, however, found that these portions of the Medical Source Statement were consistent with his RFC, which only limited Vincent to jobs that allowed *some* independence in regard to timing and pace, have close and critical supervision, and have no intense contact with the public or strangers. With this inconsistency in the ALJ's opinion, his reasoning is not easily traced, *Clifford*, 227 F.3d at 872, and he has not created "an accurate and logical bridge between the evidence and the result." *Ribaudo*, 458 F.3d at 584; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Accordingly, this case must be remanded so that the ALJ may further consider the Medical Source Statement of Dr. Waldo.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED and this case is REMANDED so that the ALJ may further consider the opinions of Dr. Waldo.

SO ORDERED.

Enter for September 7, 2010.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge